# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**DAMON WHEELER,**

                    **Plaintiff,**

         *- against -*

**DET. AHMED ARTOLA, et al.,**

                    **Defendants.**

**16CV7440 (LMS)**

**DECISION AND ORDER**

**LISA MARGARET SMITH, U.S.M.J.**[1]

    Plaintiff Damon Wheeler ("Wheeler") brought this action against Defendants Det. Ahmed

Artola, P.O. Jonathan McHugh, P.O. Richard Regino, P.O. Joseph Festa, P.O. Deborah Sommer,

P.O. Kevin Weymer, Sgt. Joseph Tobin, Lt. Jeffry Thoelen, Lt. John Ewanciw, Hratch

Kazanjian, Robert Magrill, Rose Anna Roantree, Matthew DePasquale, Jennifer Breitenfeld,

Theresa Shapiro, Orange Regional Medical Center, and the City of Middletown, asserting claims

for illegal traffic stop, excessive force, illegal search, false arrest, illegal cavity search, unlawful

imprisonment, denial of medical treatment, abuse of local, state and/or government resources,

destroying/deleting official court records and arrest records, and retaliation.  Docket # 89 ("Sixth

Amended Complaint").[2]  On September 26, 2018, the Court issued a Decision and Order on

motions for summary judgment that had been filed by the various Defendants, which resulted in

the dismissal of several claims (and therefore, several Defendants).  Docket # 232 ("SJ D&O").

The only remaining claims in the case are claims under 42 U.S.C. § 1983 (1) against Defendants

Artola and McHugh for (a) an unlawful traffic stop, (b) a false arrest, and (c) an unlawful search

---

[1]The parties have consented to my exercise of jurisdiction over this matter pursuant to 28 U.S.C.
§ 636(c).  Docket ## 38, 55, 75, 76, 226, 228.

[2]The action was commenced on September 23, 2016, but the Sixth Amended Complaint, filed on
June 30, 2017, is the current operative pleading.

of Wheeler's vehicle; (2) against Defendant Artola for the use of excessive force based on (a) punching Wheeler's face, both before Wheeler was removed from his vehicle and after he was placed in handcuffs, and (b) slamming Wheeler's head into a wall during the strip search; (3) against Defendant McHugh for failure to intervene to prevent the excessive use of force during the strip search[3]; and (4) against Defendants Artola, McHugh, and Thoelen for an unlawful strip search.

The Court conducted a three-day bench trial from July 8, 2019, to July 10, 2019. Two witnesses testified on Wheeler's behalf, and five witnesses testified on behalf of the remaining Defendants.[4] For the reasons that follow, the Court finds (1) that Wheeler has failed to prove, by a preponderance of the evidence, that Defendants Artola and McHugh are liable for his claims of an unlawful traffic stop, false arrest, an unlawful search of his vehicle, and excessive force (including McHugh's failure to intervene to prevent the use of excessive force), and (2) that Defendants Artola, McHugh, and Thoelen are entitled to qualified immunity on the claim of an unlawful strip search.

## **FINDINGS OF FACT**

The Court makes the following findings of fact as required by Rule 52 of the Federal Rules of Civil Procedure.

---

[3]Although Wheeler had also asserted the claim for failure to intervene to prevent the excessive use of force during the strip search against Defendant Weymer, and had also asserted the claim for an unlawful strip search against Defendant Weymer based on either direct participation or a failure to intervene, during the trial, Wheeler withdrew all of his claims against Defendant Weymer. Trial Transcript ("Tr.") at 345-47.

[4]Wheeler was initially represented by pro bono counsel for purposes of the trial, see Docket # 250 (Notice of Appearance of Pro Bono Counsel), but Wheeler terminated the representation on the second day of the trial. Tr. 220-24.

## A.    The Stop of Wheeler's Vehicle and the Arrest

On the night of April 5, 2014, Wheeler was working as a taxi driver, driving his own vehicle, not a marked taxi. Tr. 132. Wheeler had been working as a taxi driver since August, 2010. Tr. 132-33. Artola and McHugh, officers with the Middletown Police Department, were on patrol just after midnight on April 5, 2014. Tr. 172-73, 286.[5] Artola had been a patrol officer with the Middletown Police Department since November, 2008; he was promoted to his current position of detective in February, 2017. Tr. 171. Artola had previously worked for the Village of Pelham Police Department, from January, 2006, to November, 2008. Tr. 171-72. McHugh has been an officer with the Middletown Police Department for the past seven years; before that, he worked for two years as an officer with the Village of Greenwood Lake Police Department. Tr. 285.

Artola and McHugh were traveling eastbound on West Main Street in Middletown when they saw a vehicle traveling westbound on West Main Street without its headlights on. Tr. 173, 176, 286-87, 329. Artola made a U-turn and pulled the patrol car behind the vehicle. Tr. 176, 287. Artola radioed dispatch and notified dispatch that he was going to conduct a traffic stop, providing the location and the license plate of the vehicle. Tr. 177. When Artola pulled his patrol car behind Wheeler's vehicle, he observed that the vehicle had no operable plate lamp. Tr. 181. Artola activated his emergency lights at about 200 West Main Street in order to conduct a traffic stop; the vehicle slowed down and rolled to a stop at 245 West Main Street, approximately

---

[5]Virtually all of Artola's testimony concerning the events that transpired during the early morning hours of April 5, 2014, involving Wheeler is corroborated by Artola's Case Report, Pl.'s Ex. 16. McHugh's testimony is likewise corroborated by his Case Supplemental Narrative Report, Pl.'s Exs. 18, 36.

1/4 mile down the road.  Tr. 177-79, 288.

Artola approached the vehicle and asked the person driving, who he recognized as Wheeler,[6] for a driver's license and registration.  Tr. 180.  Wheeler complied.  Id.  Then Wheeler asked Artola why he had been stopped, and Artola explained that it was because Wheeler's headlights were off and his license plate light was not working.  Tr. 181; see Tr. 307-08 (McHugh testified that he heard Artola explain to Wheeler that he was being pulled over because the headlights on his vehicle were not illuminated).  Wheeler began arguing with Artola about whether he had committed these traffic infractions, and Artola asked Wheeler to step out of the vehicle.  Tr. 181.  Artola wanted to talk further with Wheeler and show Wheeler that his license plate light was out.  Tr. 181-82, 212.  Wheeler refused to exit the vehicle and starting grabbing his phone, saying that he was going to make a phone call.  Tr. 182.  Artola told Wheeler not to call anybody and to step out of the vehicle.  Id.  Wheeler continued to refuse.  Id.  Artola then attempted to grab Wheeler's cellphone, because he did not want Wheeler calling anyone, but Wheeler pulled the cellphone back and began shutting the window with Artola's arm inside the vehicle.  Id.  Artola punched Wheeler in the face once "just to disorient him" and removed his arm from the window area.  Tr. 183.  Wheeler closed the window completely and then opened it a little bit and kept yelling at Artola, saying "you punched me" and that he was going to record Artola.  Id.  Artola just continued telling Wheeler to step out of the vehicle.  Tr. 184.  By that point, McHugh had come over to Artola's side of the vehicle.  Id.

McHugh testified that he got out of the patrol car at the same time as Artola and stopped

---

[6]Wheeler likewise testified that he knew Artola prior to April 5, 2014.  Tr. 164.  McHugh testified that he did not know Wheeler, or know about Wheeler, before that night.  Tr. 330.

at the back of the vehicle before approaching the passenger side. Tr. 288. While McHugh was behind the vehicle, he heard Artola ask the driver for his license and registration and for him to put his phone down. Tr. 289. When McHugh got to the passenger side of the vehicle, the conversation between the driver and Artola "escalated," and McHugh heard Artola tell the driver to put the phone down and get off the phone, at which point McHugh went around to the driver side of the vehicle. Tr. 289-90. When McHugh got to the driver side of the vehicle, he observed Artola talking to the driver about hanging up the phone and asking the driver to step out of the car. Tr. 290. McHugh said that the driver was "argumentative, defiant." Id. McHugh stated that Artola reached into the car, and the driver began to roll the window up on Artola's arm. Tr. 290-91. According to McHugh, Artola at that point told the driver to put the phone down and stop, and Artola was able to pull his hand out of the window. Tr. 291. McHugh did not see Artola make any contact with the driver. Id.

Thereafter Wheeler opened the window enough for Artola to use his expandable baton to unlock Wheeler's car door. Tr. 184. Wheeler tried to grab the baton, Tr. 259, 312, but McHugh was able to open the door. Tr. 184, 312; see Tr. 291 (McHugh testified that Artola used his expandable baton to unlock the car door, and McHugh opened the driver side door and removed the driver from the vehicle by grabbing his upper torso and pulling him out of the car and onto the ground). After McHugh opened the car door, Artola put his baton away and removed Wheeler from the vehicle by grabbing Wheeler's arm and pulling him out. Tr. 185; but see Tr. 312-13 (McHugh testified that he was the one who dragged Wheeler to the ground after he was removed from the vehicle, not Artola, and that "[t]o the best of my recollection," Artola "had no part in dragging [Wheeler] to the ground and handcuffing him"). As Artola was pulling Wheeler

out of the vehicle, Wheeler was resisting, pulling his arm away. Tr. 185. Artola was able to get Wheeler on the ground behind his vehicle. Id. Once Wheeler was on the ground, Wheeler continued to resist by refusing to put his hands behind his back when Artola ordered him to do so. Tr. 186-87; see Tr. 314 (McHugh testified that Wheeler resisted arrest by refusing to step out of his vehicle and placing his arms under his body after being told that he was under arrest). Artola had to lean his leg on Wheeler's back to keep Wheeler down on the ground and get Wheeler's arms out from under him, at which point, McHugh was able to handcuff Wheeler. Tr. 185-88. McHugh testified to placing Wheeler face-down on the ground and manipulating Wheeler's left arm into an "arm bar," i.e., "straightening his arm out and using his elbow and shoulder to manipulate his joints," to gain compliance so that he could handcuff Wheeler. Tr. 291-92, 317. McHugh said that Artola was still on the other side of the car door when McHugh was removing the driver from the vehicle, but when they were on the ground, Artola helped handcuff the driver. Tr. 291, 313.

Wheeler was then placed in a patrol car to be transported to the Middletown Police Department. Tr. 187. McHugh testified that Wheeler was placed in his and Artola's patrol car. Tr. 293, 318.[7] Artola denied that he punched, slapped, kneed, or kicked Wheeler after pulling him out of the vehicle and placing him on the ground, Tr. 187-88, and McHugh corroborated this testimony, stating that no one punched, slapped, or kicked Wheeler while he was on the ground. Tr. 292-93, 313, 317. According to McHugh, Wheeler did not have any facial or head injuries when he was placed under arrest or in the patrol car, or when they arrived at the police station.

---

[7]McHugh testified that Wheeler was subjected to a search—a "pat down"—prior to being placed in the patrol car. Tr. 293, 317-18.

Tr. 296, 300, 314, 318[8]; see Tr. 334 & Pl.'s Ex. 20 at 1 (Sgt. Tobin's memo to Lt. Thoelen states that when Sgt. Tobin responded to the scene of the incident on West Main Street, he was advised by the officers present that "neither [Wheeler] nor any officers were injured"; the memo also notes that the "lighting was poor in the area of the arrest").[9]

Wheeler's testimony contradicted that of Artola and McHugh in all material respects.

He testified that he was driving his Toyota minivan with "all my lights on" and that "everything" on his minivan was in "working condition," including the plate lamp on the back of the vehicle. Tr. 43-44. Wheeler added that he got his vehicle inspected on a regular basis. Tr. 44. Wheeler disputed where he stopped his vehicle, testifying that as he drove past the Mobil gas station on West Main Street, he saw a group of police cars, and as soon as he passed the traffic light at the intersection, he noticed "flashing red lights . . . in my rearview." Id. Wheeler stated

_____

[8]McHugh also did not notice any injuries on Wheeler when the strip search was conducted. Tr. 322; but see Tr. 194-95 (Artola testified that at the time of strip search, he noticed "a scrape or an abrasion in [Wheeler's] face"). McHugh testified that he noticed redness on Wheeler's cheek when Wheeler was being interviewed by the paramedics about a purported seizure he experienced while he was in the holding cell at the police station. Tr. 303-04. The purported seizure occurred around 2:38 am, over two hours after the traffic stop, which occurred around 12:16 am. See Pl.'s Ex. 20 (Intra Agency Memo). However, McHugh's testimony is in conflict with the Subject Resistance Report that he signed on April 5, 2014, in which McHugh noted that during the course of the arrest, Wheeler suffered injuries, which McHugh described as "facial redness on right side of face." Pl.'s Ex. 19; see also Pl.'s Ex. 17 (Artola's Subject Resistance Report that he signed on April 5, 2014, in which Artola noted that during the course of the arrest, Wheeler suffered injuries, which Artola described as "facial redness").

[9]Sergeant, now Lieutenant, Joseph Tobin's memo was "a brief summary of an investigation conducted in regards to minor injuries sustained to defendant Damon Wheeler while in police custody" on April 5, 2014. Pl.'s Ex. 20 at 1. Tobin, who began his employment with the Middletown Police Department in June, 2001, was promoted several times, including promotions in 2008 to the rank of sergeant and 2018 to the rank of lieutenant. Tr. 331-32. On the night of April 5, 2014, he was serving as the patrol sergeant on the midnight shift. Tr. 332. As such, he was responsible for overseeing field operations and personnel. Id.

that he pulled over a "little bit past the light. . . . it wasn't too far down the road." Tr. 44-45. He

added, "I was a little bit past the intersection, because you can still see the streetlights. There's a

big white building on that corner . . . on my side on the corner. So, from the corner to the

building, . . . maybe goes maybe around a hundred — maybe a little bit more than a hundred feet

. . . ." Tr. 45. Wheeler continued to elaborate, "There is a liquor store on the corner of that  . . .

intersection, but it was about maybe five or six houses down. Because after the intersection,

there's a parking lot, and then maybe five or six houses down, I stopped and pulled over. There

was nothing odd about the traffic stop." Tr. 45-46.[10]

Wheeler said that he pulled over and locked the door of his car because "Middletown

Police have a habit of just pulling your door open and asking you to step out of the car. . . . [A]ll I

did was lock my door and pull my window down and activated my cellphone." Tr. 50. Wheeler

testified that he then took a cellphone video of his interaction with Artola, following which he

was "dragged out the car and thrown in the back of a police car." Tr. 53. More specifically,

Wheeler stated,

> I stopped, pulled over safely, locked my window, locked my door, pulled
> my window down, activated the cellphone. When I turned around, he was

---

[10]On cross-examination, Wheeler testified that the aerial photograph of West Main Street, Pl.'s
Ex. 32/32-A, does not include the location where he stopped his vehicle because the gas station is
not shown in the photograph, and he "was stopped a little bit before 200 [West Main Street]."
Tr. 133-34; see also Tr. 48-49 (On direct examination, Wheeler testified, "I don't see the gas
station [on Exhibit 32/32-A]. . . . [Y]ou have to understand that the location of the gas station is
important, because that's where they started, and the lights came on right after they pulled out of
the gas station. I didn't stop too far past the gas station, so for them to say that I stopped way
down at 245 West Main Street is wrong, it's incorrect, because we didn't go too far past the gas
station. . . . [T]hat map doesn't seem appropriate to me because it should show the location of the
gas station first. If it showed the location of the gas station, I could better describe to you where I
actually stopped at."). Wheeler disputed that Artola activated his patrol car lights at 200 West
Main Street as noted on the photograph. Tr. 134.

> there, and all he did was reach for my door handle. He didn't identify
> himself, he didn't tell me I was speeding, my lights was off. He didn't ask
> me for a license and registration, nothing. He pulled the door, and when
> the door wasn't opened, he punched me in my mouth.

Tr. 54; see also Tr. 135 ("As soon as I stopped. I locked my door, opened my window, activated the cellphone, and, by that time, [Artola] was right there. . . . [The video was activated] [a]round the same time as the punch."). After getting punched in the mouth by Artola, Wheeler closed the window about two-thirds of the way. Tr. 54. Wheeler said that Artola did not ask him for a license or registration or tell Wheeler why he had pulled over the car. Tr. 55-56. Wheeler stated that after he took the cellphone video, he turned off his phone, put the cellphone down, unbuckled his seatbelt, and "just prepared myself for what was coming next." Tr. 57-58. Wheeler said that he unbuckled his seatbelt because he knew he was about to be dragged out of the car. Tr. 60. He "just braced myself for a beating." Id. According to Wheeler, after Artola opened the car door and dragged Wheeler out, he threw Wheeler to the ground, put his knee in Wheeler's back, put Wheeler in an arm bar, and threw Wheeler's hands behind his back. Tr. 61. Wheeler added that Artola handcuffed him and, after he was handcuffed, struck him with just one blow while Wheeler's face was on the ground. Tr. 61-63.

The Court credits the testimony of Artola and McHugh regarding the stop of Wheeler's vehicle as to both where and why it occurred. Although Wheeler disputes the location of the stop, testifying that where Artola activated his patrol lights and where Wheeler pulled over are not even shown on the aerial photograph of West Main Street introduced into evidence at trial (Pl's Ex. 32/32-A), circumstantial evidence in the record corroborates the testimony of Artola and McHugh, establishing that other officers arrived on the scene in response to Artola's radio

transmission in which, as Artola testified, he would have notified dispatch that he was going to conduct a traffic stop and provided the location and the license plate of the vehicle. See Pl.'s Exs. 17, 18, 19, 20, 36; Tr. 177, 333. In addition, evidence in the record demonstrates that Wheeler's criminal prosecution stemming from the events of April 5, 2014, included charges under New York's Vehicle and Traffic Law for inadequate lights and an inadequate plate lamp. See Pl.'s Exs. 16 (Artola's Case Report), 23 (Intra Agency Memo); see also Tr. 268 (Artola testified on cross-examination to issuing traffic tickets for inadequate plate lamp and inadequate headlights).

The cellphone video taken by Wheeler was shown to the Court at trial. Pl.'s Ex. 1. It is a 23-second clip taken by Wheeler from inside his vehicle, with the window closed, showing a flashlight being shone into the vehicle, presumably by Artola. In the video, Wheeler asks Artola why he just punched Wheeler in the mouth, and although it is hard to hear Artola's response, he says that Wheeler "can videotape me all you want," he just wants Wheeler to step out of the car and to talk to Wheeler. It is apparent that the cellphone was not activated from the outset of the interaction between Artola and Wheeler but rather, was activated at some point after the interaction had begun. See Tr. 308 (McHugh testified, "This video started well into the traffic stop. . . . Officer Artola provided the Plaintiff with the reason for the traffic stop upon approaching the vehicle."). It is also apparent from Wheeler's tone of voice in the video that his reaction to Artola was angry and antagonistic. The Court does not observe anything in the cellphone video which substantiates Wheeler's claim that Artola just walked up to Wheeler's car and suddenly punched Wheeler in the face for no reason, nor does it substantiate Wheeler's testimony that he activated his cellphone at the same time as the punch. Rather, the Court finds

credible the testimony of Artola and McHugh that Wheeler was arguing with Artola and refusing to exit the vehicle[11]; that Wheeler then began videotaping Artola on his cellphone, causing Artola to reach into the vehicle to grab to phone; that Wheeler at that point began to close the window, causing Artola to punch Wheeler in the mouth in order to avoid having the window close on his arm; and that Artola thereafter used his baton to open the car door so that he could remove Wheeler from the vehicle.

There is evidence in the record to substantiate the finding that in the aftermath of Wheeler's removal from his vehicle and placement on the ground and in handcuffs, the application of force that was used in the process caused him to suffer minor injuries to the right side of his face and his left ear. Pl.'s Exs. 3 & 5 (photos), Pl.'s Ex. 6 (hospital records) at page 4 ("Contusion to right side of face. Contusion and hematoma to left pinna of the ear."). Although this same evidence also shows that Wheeler suffered an injury to the back of his head, Pl.'s Exs. 3 & 5 (photos), Pl.'s Ex. 6 (hospital records) at page 4 ("Contusion to occipital region of head."), there is insufficient basis for the Court to conclude that this injury was caused by that same use of force. The Court does not credit Wheeler's testimony that Artola punched him after he was handcuffed and with such force that "the lights went out." Tr. 62-63.

B.     The Search of the Vehicle

After removing Wheeler from the vehicle, Artola searched Wheeler's immediate grabbable area in the vehicle because of Wheeler's delay in bringing his vehicle to a stop, his defiance to the orders to exit the vehicle, and his status as a known drug dealer. Tr. 188-89; see

---

[11]On cross-examination, Wheeler conceded that he "refused" Artola's orders to get out of the car. Tr. 135-36.

Pl.'s Ex. 16 (Case Report). Artola testified that prior to the night in question, he knew of confidential informants who had purchased drugs from Wheeler, and Artola had witnessed Wheeler selling drugs to confidential informants. Tr. 189. The Court credits Artola's testimony regarding the basis for the search.

Artola and McHugh searched Wheeler's vehicle and recovered chunky white substances that field-tested positive for cocaine, as well as an open bottle of Hennessey, an alcoholic beverage. Tr. 190-92, 264-67, 319; Defs.' Ex. A (photographs of evidence bags and plastic bag found in Wheeler's vehicle); Pl.'s Ex. 15 (Police Record, including reports of narcotics field-tests). More specifically, McHugh testified that he saw a "clear plastic bag on the front passenger seat with an off-white substance in it," Tr. 294, as well as a bottle of Hennessey liquor in the backseat that "appeared to be somewhat consumed." Tr. 295. McHugh removed both of these items from the vehicle. Tr. 294-95. Artola told McHugh that he found more of what Artola thought was a controlled substance on the floor of the vehicle. Tr. 295.

C.     **The Strip Search**

After the search of Wheeler's vehicle, Artola and McHugh transported Wheeler to the police station. Tr. 295-96. Artola testified that following his arrival at the police station, he requested permission from Thoelen, the supervisor on duty, to strip search Wheeler. Tr. 192-93.[12] The grounds for the strip search were Wheeler's possession of crack cocaine in his vehicle, Wheeler's delay in stopping his vehicle after Artola initiated a traffic stop, and Wheeler "being a

_____

[12]Lieutenant Jeffry Thoelen, who began his employment with the Middletown Police Department on August 22, 2005, was promoted to the rank of patrol sergeant in 2010 and to the rank of lieutenant, his current position, in 2014. Tr. 347-48. Thoelen was a lieutenant on the date of the incident in question. Tr. 348-49.

known drug dealer," including Artola's previous observations of Wheeler selling cocaine. Tr. 193. Artola testified that after describing to Thoelen his reasons for wanting to conduct the strip search, he received permission from Thoelen to do so. Tr. 194, 270; see Tr. 296, 320 (McHugh testified that a supervisor, he believes Thoelen, authorized the strip search, but he himself did not speak to the supervisor). Thoelen testified that he was the shift supervisor the night of April 5, 2014, Tr. 349, and that as shift supervisor, officers would have to ask him for permission to conduct a strip search if they were processing a defendant they believed may be in possession of contraband. Tr. 350. Thoelen did not, however, have any specific recollection of giving permission for the strip search of Wheeler. Tr. 350-52, 368.[13]

Artola stated that the strip search was conducted in a "little foyer area between the men's cells and the women's holding cells" that Middletown police use for strip searches. Tr. 194. He and McHugh were the only officers present. Tr. 194, 196, 297, 321. McHugh brought his Taser into the strip search area, which is standard procedure, for officer safety, since the subjects of strip searches sometimes "become irrational or combative and the [T]aser is just a mere physical visual deterrent of that." Tr. 297, 321; see also Tr. 274 (Artola testified on cross-examination that McHugh may have had his Taser out and the need for a Taser was "a safety issue and also to make sure that the defendant is not going to actively resist or try to swallow any drugs that we may find on him"). Artola commanded Wheeler to take off his articles of clothing one by one,

---

[13]At trial, Thoelen said he had since reviewed Artola's paperwork concerning the strip search. When asked, "if the reasons [Artola] has given in his paperwork for the strip search were presented to you in that fashion, would you have approved it," he responded, "Yes." Tr. 351. However, Defendants' counsel was not referring to a specific trial exhibit when he asked that question, and none of Artola's paperwork that was admitted into evidence at trial includes a statement regarding Artola's reasons for wanting to conduct the strip search. The Court does not know what paperwork Thoelen reviewed that formed the basis for his answer to that question.

and as each article of clothing was taken off, Artola searched it for contraband. Tr. 196, 298. The only thing Artola found was "like a napkin or tissues or something" in Wheeler's underwear which, according to Artola, "is normally used to conceal narcotics"; however, Artola did not find any narcotics inside the tissue. Tr. 196, 240, 298. After Wheeler had taken off all of his clothing, Artola told Wheeler to squat and spread his butt cheeks and cough, which Wheeler did. Tr. 197-98. Artola was right behind Wheeler when he did this, as was McHugh. Tr. 197; see Tr. 299 (McHugh testified that Artola examined Wheeler visually when all of Wheeler's clothes were off, from "within two to three feet" of Wheeler). Artola and McHugh made a visual observation to see if any narcotics could be seen in Wheeler's rectal area, and they did not see anything. Tr. 198. Artola testified that he did not touch Wheeler at any point during the strip search, nor did McHugh. Tr. 198; see Tr. 299 (McHugh testified that he did not touch Wheeler at any time during the strip search). Artola denied putting any light near Wheeler's body. Tr. 198-99. Artola explained that McHugh might have had his Taser out for safety reasons, and the Taser light might have been on. Tr. 197-98. After Wheeler had squatted down, and Artola had made his visual inspection, which lasted about "a second or two," Wheeler was given his clothes back and told to get dressed. Tr. 199; see Tr. 299 (according to McHugh, the strip search took about five minutes, and Wheeler was without all of his clothes on for about a minute or two). According to Artola, "if there was an incident where somebody had something in their rectum and refused to take it out themselves, there would be transport to the hospital and the hospital would remove it." Tr. 199. Artola testified that nothing unusual happened during the strip search and that Wheeler did not make any complaints during the strip search. Tr. 200; see also 274-75 (Artola testified on cross-examination that Wheeler did not resist being strip searched; that no force had to be used

14

against Wheeler during the strip search; and that Wheeler was not injured during the strip search), 278 (on cross-examination, Artola denied tackling Wheeler or forcing Wheeler's head into the wall during the strip search). Similarly, McHugh testified that nothing unusual happened during the strip search, and that Wheeler did not make any complaints and was neither struck nor tackled during the strip search. Tr. 297-98, 322-23.

Wheeler provided an entirely different version of events. Wheeler testified that Artola told him, after he had taken off all of his clothes, to turn around, bend over, and spread his butt cheeks, at which point he was tackled by Artola. Tr. 70-71. Wheeler further stated that Artola tackled him and threw him into the wall, banging Wheeler's head on the wall, at which point some other, unspecified officers, who were also in the strip-search room, tackled Wheeler as well. Tr. 71,[14] 83. Wheeler stated that he was then curled up in a fetal position and being pressed against the wall by the other officers, with his head pressed up against the wall, when he felt Artola penetrate his anus with his finger and use a flashlight to see inside his anus. Tr. 71-74.[15]

The Court credits the testimony of Artola and McHugh regarding the strip search. There is no evidence, other than Wheeler's vague testimony, to substantiate the presence of any other police officers in the room during the search, and the Court does not credit Wheeler's testimony that Artola tackled Wheeler and threw him into the wall head first, or that Artola in any way

[14]Wheeler testified that he was surrounded by five or six officers in the strip-search room, including Artola and McHugh. Tr. 68. Wheeler stated that Weymer was in the room as well. Id. As noted above, see footnote 3, during the trial, Wheeler decided to dismiss all claims against Weymer. Wheeler could not identify the other officers in the strip-search room. Tr. 68.

[15]McHugh testified that his Taser had both a flashlight and a laser, but they were off during the strip search. Tr. 323.

penetrated Wheeler.

**CONCLUSIONS OF LAW**

I.      **Unlawful Traffic Stop**

As the Second Circuit has explained,

> The temporary detention of an individual during a traffic stop is subject to
> limitation under the Fourth Amendment as a "seizure" of the person.
> Whren v. United States, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 135 L.
> Ed.2d 89 (1996).  The Fourth Amendment requires that an officer making
> such a stop have probable cause or reasonable suspicion that the person
> stopped has committed a traffic violation or is otherwise engaged in or
> about to be engaged in criminal activity.  Id. at 810, 116 S. Ct. 1769;
> United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed.2d
> 740 (2002).  Whether probable cause or reasonable suspicion exists is an
> objective inquiry; the "actual motivations of the individual officers
> involved" in the stop "play no role" in the analysis. Whren, 517 U.S. at
> 813, 116 S. Ct. 1769.

Holeman v. City of New London, 425 F.3d 184, 189-90 (2d Cir. 2005).  "An automobile stop is

thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances.

As a general matter, the decision to stop an automobile is reasonable where the police have

probable cause to believe that a traffic violation has occurred." U.S. v. Harrell, 268 F.3d 141,

148 (2d Cir. 2001) (quoting Whren, 517 U.S. at 810) (internal quotation marks omitted).

In this case, Wheeler disputes that he was stopped based on a traffic violation, claiming

that his car was in working order, and that he was not traveling without either his headlights on

or an operable plate lamp.  Wheeler testified that Artola never told him that he had committed

any traffic infraction.  However, the Court finds the testimony of Artola and McHugh regarding

the traffic violations which formed the basis for the stop, and the conduct of the stop itself, to be

credible.  Moreover, Artola's Case Report concerning Wheeler's arrest on April 5, 2014, notes

that tickets were issued to Wheeler for inadequate lights and an inadequate plate lamp, which are violations of New York's Vehicle and Traffic Law.[16]  See Pl.'s Ex. 16 at 2; see also Pl.'s Ex. 23 (Intra Agency Memo noting that "Wheeler was also issued summons [sic] for inadequate plate lamp, no headlights . . .").  The cellphone video taken by Wheeler shows only a 23-second clip of what occurred at some point after Wheeler's vehicle had been stopped, and thus, it proves nothing about the lawfulness of the stop itself.

Accordingly, the Court concludes, based on the evidence presented at trial, that Wheeler has failed to prove, by a preponderance of the evidence, that the traffic stop was unlawful.[17]

---

[16]See N.Y. Veh. & Traf. Law §§ 375(2)(a)(1), (4) ("Every motor vehicle except a motorcycle, driven upon a public highway during the period from one-half hour after sunset to one-half hour before sunrise . . . and at such other times as visibility for a distance of one thousand feet ahead of such motor vehicle is not clear, shall display: . . . at least two lighted head lamps on the front, one on each side, having light sources of equal power; . . . and . . . if required to display a number plate on the rear, a white light which shall illuminate the numerals on such plate in such manner as to render such numerals legible for at least fifty feet from the rear. . . ..").

[17]Records from Orange Regional Medical Center related to Wheeler's admission on April 5, 2014, due to a possible seizure, state that Wheeler was found smoking crack.  See Pl.'s Ex. 6 at 3 ("Pt was reportedly found smoking crack/cocaine by Middletown Police and so he swallowed the remaining drugs, as per Middletown Police.").  Although Artola and McHugh both deny making such a statement to the hospital staff, Tr. 247-48 (Artola testified that Wheeler was not found smoking crack and that he did not witness Wheeler swallowing drugs, and he denied reporting to hospital staff that Wheeler was found smoking crack; Artola testified that part of this report was incorrect), 305-06 (McHugh testified that Wheeler was not found smoking crack, nor did he witness Wheeler swallowing any drugs; McHugh testified that this report to the hospital staff was false but that he did not know who made the report), this discrepancy in the record does not preclude the Court from finding that the officers had probable cause to stop Wheeler's vehicle based on traffic violations.

## II.     First Amendment Retaliation

> "[A]s a general matter the First Amendment prohibits government officials
> from subjecting an individual to retaliatory actions" for engaging in
> protected speech.  Hartman v. Moore, 547 U.S. 250, 256, 126 S. Ct. 1695,
> 164 L. Ed.2d 441 (2006).  If an official takes adverse action against
> someone based on that forbidden motive, and "non-retaliatory grounds are
> in fact insufficient to provoke the adverse consequences," the injured
> person may generally seek relief by bringing a First Amendment claim.

Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019) (citation omitted).  "To prevail on such a claim,

a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory

animus' and the plaintiff's 'subsequent injury.' "  Id. (quoting Hartman, 547 U.S. at 259).  The

Supreme Court held that with respect to First Amendment retaliatory arrest claims, a plaintiff

must plead and prove the absence of probable cause.  Id. at 1723.  "Absent such a showing, a

retaliatory arrest claim fails.  But if the plaintiff establishes the absence of probable cause, 'then

the Mt. Healthy[18] test governs:  The plaintiff must show that the retaliation was a substantial or

motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only

by showing that the [arrest] would have been initiated without respect to retaliation.' "  Id. at

1725 (quoting Lozman v. Riviera Beach, 138 S. Ct. 1945, 1952-53 (2018) (citing Hartman, 547

U.S. at 265-66)).

The Supreme Court held, however, that "[a]lthough probable cause should generally

defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where

officers have probable cause to make arrests, but typically exercise their discretion not to do so."

Id. at 1727.  In other words, "the no-probable-cause requirement should not apply when a

plaintiff presents objective evidence that he [or she] was arrested when otherwise similarly

---

[18]Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274 (1977).

situated individuals not engaged in the same sort of protected speech had not been." Id.

In his pretrial memorandum of law, Wheeler argues that he "engaged in protected speech prior to being assaulted, arrested, and assaulted again [when he] complained to Defendant Artola and took video of him," and that he "was arrested for a minor traffic infraction of the sort that normally would not trigger an arrest, and where the officer did not identify a crime for which probable cause existed until *after* the arrest." Docket # 258 ("Pl.'s Pretrial Mem.") at 5 (emphasis in original) (footnotes omitted). However, Wheeler did not present any evidence at trial to support the conclusion that "otherwise similarly situated individuals not engaged in the same sort of protected speech" were not arrested for similar crimes, and therefore, he did not demonstrate that he fell within the exception to the requirement that he prove the absence of probable cause for his arrest. As explained above, the Court concludes that Artola had probable cause for the traffic stop based on Wheeler's commission of traffic violations and, "[u]nder New York State law, it is clear that a traffic offense can be a basis for an arrest." United States v. Scopo, 19 F.3d 777, 785 (2d Cir. 1994) (citations omitted) (finding that law enforcement officers had probable cause to stop and arrest plaintiffs based on failure to signal lane changes in violation of New York traffic laws); see N.Y. Crim. Proc. Law § 140.10(1)(a) ("[A] police officer may arrest a person for . . . [a]ny offense when he or she has reasonable cause to believe that such person has committed such offense in his or her presence[.]"); N.Y. Veh. & Traf. Law § 155 ("For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense."). " 'When an officer observes a traffic offense–however minor–he [or she] has probable cause to stop the driver of the vehicle' and effect a subsequent arrest for that offense." Kennedy v. City of New York, 570 F. App'x 83, 84

(2d Cir. 2014)[19] (quoting Scopo, 19 F.3d at 782).

Because Wheeler has failed to prove, by a preponderance of the evidence, that there was no probable cause for the traffic stop and, therefore, that there was no probable cause for his arrest based on the traffic violations that gave rise to the traffic stop, Wheeler has failed to prove, by a preponderance of the evidence, that he was subjected to a retaliatory arrest in violation of his First Amendment rights.[20]

## III.  False Arrest

"The common law tort of false arrest is a species of false imprisonment, an action derived from the ancient common-law action of trespass [that] protects the personal interest of freedom from restraint of movement."  Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) (internal quotation marks and citation omitted).  "Under New York law, a plaintiff claiming false arrest must show, inter alia, that the defendant intentionally confined him [or her] without his [or her] consent and without justification."  Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (citation omitted).  A claim for false arrest under 42 U.S.C. § 1983 is substantially the same as a claim for false arrest arising under state law.  Id. (citations omitted).  "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest whether that action is brought under state law or under § 1983."  Id. (internal quotation marks and citations omitted).

Probable cause to arrest exists "when the arresting officer has knowledge or reasonably

_____

[19]Copies of all unpublished opinions are being sent to Wheeler with his copy of this Decision and Order.

[20]In reaching its conclusion, the Court assumes arguendo that Wheeler was engaged in protected First Amendment activity when he argued with Artola and took the cellphone video.

trustworthy information sufficient to warrant a person of reasonable caution in the belief that an

offense has been committed by the person to be arrested." Singer, 63 F.3d at 119 (internal

quotation marks and citation omitted). "Whether or not an officer had probable cause to make an

arrest is a question of what the officer knew at the time of the arrest and whether she or he was

reasonable in relying on that knowledge." Coyle v. Coyle, 354 F. Supp. 2d 207, 211 (E.D.N.Y.)

(internal quotation marks and citation omitted), aff'd, 153 F. App'x 10 (2d Cir. 2005)

(unpublished opinion).

Probable cause need not be "predicated upon the offense invoked by the arresting officer,

or even upon an offense 'closely related' to the offense invoked by the arresting officer," but only

on whether probable cause existed for the arrest. Jaegly v. Couch, 439 F.3d 149, 153-54 (2d Cir.

2006). When reviewing the propriety of a false arrest claim, the Court must "focus on the

validity of the arrest, and not the validity of each charge." Id. at 154 (emphasis in original); see

also id. (A "plaintiff is not entitled to damages under § 1983 for false arrest so long as the arrest

itself was supported by probable cause, regardless of whether probable cause supported any

individual charge identified by the arresting officer at the time of arrest."). "[T]he probable cause

inquiry is objective rather than subjective." Id. (citation omitted).

Defendants contend that Artola and McHugh had probable cause to arrest Wheeler for

both the traffic violations and obstruction of governmental administration based on his refusal to

exit his vehicle when ordered to do so by Artola. Docket # 264 ("Defs.' Proposed Findings") at

10-12. As explained above, a traffic infraction can be the basis for an arrest under New York

law, Scopo, 19 F.3d at 785, and the Court concludes Artola and McHugh had probable cause to

stop and arrest Wheeler for the traffic violations he had committed. In addition, Wheeler

conceded that he "refused" Artola's orders to exit his vehicle, Tr. 135-36, thereby giving rise to probable cause to arrest Wheeler for obstruction of governmental administration. Murray v. Ruderfer, 15 Civ. 913 (ER), 2017 WL 1194371, at *5 (S.D.N.Y. Mar. 31, 2017) ("An officer has probable cause to arrest for obstructing governmental administration where a person refuses to comply with an order from a police officer.") (internal quotation marks and citations omitted); see N.Y. Penal Law § 195.05 ("A person is guilty of obstructing governmental administration when he [or she] intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act . . .."); see also Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977) (per curiam) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").[21]

Accordingly, the Court concludes, based on the evidence presented at trial, that Wheeler has failed to prove, by a preponderance of the evidence, that he was falsely arrested by Artola and McHugh.

## IV.    Unlawful Search of Vehicle

Defendants contend that the search of Wheeler's vehicle was lawful under the "automobile exception" to the Fourth Amendment. "The 'automobile exception' permits law

---

[21]With respect to the crime of obstructing governmental administration, "New York courts have further held that the official function being performed must be one that was 'authorized by law.' " Murray, 2017 WL 1194371, at *4 (citations omitted). Here, Artola had lawfully detained Wheeler's vehicle for traffic violations; therefore, under Mimms, Artola's order for Wheeler to exit the vehicle was lawful as well.

enforcement officers to search without a warrant a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband." United States v. Babilonia, 854 F.3d 163, 178 (2d Cir. 2017) (internal quotation marks and citations omitted). "If the exception applies, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Id. (internal quotation marks and citation omitted). "As the Supreme Court has repeatedly explained, 'probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts.' " United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). "[P]robable cause exists where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man [or woman] of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." Id. (internal quotation marks and citations omitted). "The standard does not demand certainty but only a 'fair probability' that contraband or evidence of a crime will be found." Id. at 457 (quoting Gates, 462 U.S. at 238). "Further, courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a [layperson] might not." Id. Courts employ a " 'totality-of-the-circumstances' approach to determine whether there is probable cause." United States v. Pughe, 441 F. App'x 776, 777 (2d Cir. 2011) (citing Gates, 462 U.S. at 230-31).

At trial, Artola testified that he searched Wheeler's vehicle on account of Wheeler's delay in bringing his vehicle to a stop, his defiance to the orders to exit the vehicle, and his status as a

known drug dealer. Tr. 189.[22] Artola added that prior to the night in question, he knew confidential informants who had purchased drugs from Wheeler, and Artola had witnessed Wheeler selling drugs to confidential informants. Id. As stated above, the Court credits the testimony of Artola and McHugh that Wheeler pulled over his vehicle at 245 West Main Street which, as shown in the aerial view of West Main Street, Pl.'s Ex. 32/32-A, is at some distance from 200 West Main Street, the location at which Artola activated his patrol car emergency lights. Wheeler concedes that he refused to follow Artola's orders to exit the vehicle, and the cellphone video evidences Wheeler's resistance. Moreover, immediately preceding the recording of the cellphone video, Wheeler had attempted to close the car window while Artola's arm was still inside the vehicle.[23] There is also evidence in the record that Wheeler admitted to a history of being a drug dealer. Tr. 149-51.[24] Under the totality of the circumstances, the Court finds that

---

[22]This echoes Artola's Case Report regarding Wheeler's arrest, which states,

> Once on the ground the defendant was placed under arrest and in handcuffs by PO McHugh. R[eporting]/O[fficer] then began searching the immediate grabbable area of the defendant within the vehicle. This is due to the defendant taking longer than normal to pull over, his active defiance in exiting the vehicle, and R/O's knowledge of the defendant to be a crack cocaine dealer.

Pl.'s Ex. 16 at 2.

[23]Artola was reprimanded for reaching into the vehicle, see Pl.'s Ex. 22 ("Officer Artola was spoken to regarding these concerns and appears to have a better understanding of the risks associated with his conduct."), Pl.'s Ex. 23 (issues with Wheeler's arrest were addressed through counseling); see also Section V.A., infra, as such an action may have placed his safety at risk. This does not alter the basis for the arrest and subsequent search.

[24]On cross-examination, Wheeler acknowledged his deposition testimony in which he had admitted to telling someone that he had been a drug dealer. Tr. 149-51. It was also elicited on cross-examination that Wheeler had been convicted in federal court of conspiracy to possess and distribute cocaine, and that the charges leading to the conviction involved actions taken by

Artola's and McHugh's search of Wheeler's vehicle was lawful under the automobile exception. See United States v. White, 298 F. Supp. 3d 451, 460 (E.D.N.Y. 2018) (officers had probable cause to search vehicle where driver refused officers' commands to exit the vehicle and "also began moving around inside the car in a highly suspicious manner," including rolling up the window and locking the doors).

Accordingly, the Court concludes, based on the evidence presented at trial, that Wheeler has failed to prove, by a preponderance of the evidence, that Artola and McHugh unlawfully searched his vehicle.

## V. Excessive Force

"Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.' " Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks and citations omitted).  In applying that balancing test, a court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." Id. (citation omitted).  Indeed, "[t]he calculus of reasonableness must embody

---

Wheeler in the Middletown area.  Tr. 155-56.

allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97.

###    A.    During the course of the arrest

As stated above, the Court does not credit Wheeler's testimony regarding the initial punch by Artola. Rather, the Court credits Artola's testimony that he punched Wheeler when he reached into the car to grab Wheeler's cellphone, and Wheeler began to close the window with Artola's arm still inside the vehicle. Although Artola created the situation which necessitated his use of force, the use of force was not objectively unreasonable under the circumstances. Lieutenant, now Chief, John Ewanciw,[25] testified at trial as to the report he issued about the use of force involving Wheeler, and in that report, Ewanciw stated as follows:

> In regards to Wheeler utilizing his cell-phone during the stop, I do agree that it could be viewed as an Officer Safety issue, as the possibility does exist that Wheeler could have been making arraignments [sic][26] to endanger the Officers, and I agree that it could impede and/or interfere with the Officers['] further investigation efforts, however given the circumstances of the stop I do not believe that Officer Artola was justified in trying to prevent Wheeler from using his cell-phone. As indicated in Officer Artola's report Wheeler claimed he was calling his wife, which seems to be reasonable given the situation. Furthermore Officer Artola should know better than to reach into a vehicle, as the inherent risks could be deadly, and if he didn't reach into the vehicle in an attempt to grab Wheeler's cell-phone, he would not have placed himself in jeopardy of becoming injured, by the closing window and therefore would not have had·to utilize force to protect himself.

---

[25]Ewanciw, who became Chief of the Middletown Police Department in July, 2017, began his career with the Middletown Police in January, 2000. Tr. 383. He was promoted several times prior to becoming Chief: in early 2006 to the rank of Sergeant, and in February, 2010, to the rank of Lieutenant. Id.

[26]Ewanciw testified at trial that he meant to use the word "arrangements." Tr. 389.

Pl.'s Ex. 23. This use of force, albeit preventable, does not rise to the level of being unconstitutionally excessive.

As to the use of force after Wheeler was removed from the vehicle and in handcuffs, the Court does not credit Wheeler's testimony that Artola punched him in the head while he was face-down on the ground and handcuffed. Rather, the evidence at trial establishes that Wheeler suffered minor injuries to the right side of his face and his left ear that are consistent with the use of force that was needed to remove Wheeler from his vehicle, place him on the ground, and place him in handcuffs, all of which the Court already determined in its summary judgment decision did not constitute an excessive use of force. See SJ D&O at 30-31. Although, as noted above, there is evidence that Wheeler suffered a minor injury to the back of his head as well, Wheeler has not produced evidence sufficient to allow the Court to determine how this injury was sustained, let alone to determine that it was the result of an excessive use of force in the course of removing Wheeler from his car and placing him under arrest.

Accordingly, the Court concludes, based on the evidence presented at trial, that Wheeler has failed to prove, by a preponderance of the evidence, that excessive force was used during the course of his arrest.

B.    **During the strip search**

Wheeler claims that Artola slammed his head into the wall during the strip search, causing the contusion to the back of his head. As noted above, however, the Court does not credit his testimony regarding the manner in which the strip search was conducted. Accordingly, the Court concludes, based on the evidence presented at trial, that Wheeler has failed to prove, by

a preponderance of the evidence, that Artola used excessive force during the strip search.

Because Wheeler's claim against McHugh was based on the Officer's failure to intervene to prevent Artola's use of excessive force during the strip search, the Court consequently concludes that Wheeler has failed to prove, by a preponderance of the evidence, McHugh's liability on this claim.

## VI.    <u>Unlawful Strip Search</u>

Wheeler claims that he was subjected to an unlawful strip search, amounting to a manual body cavity search, while he was at the police station.  As noted above, the Court credits Artola's and McHugh's testimony regarding the strip search.  According to Artola, he had Wheeler take off his articles of clothing one by one, and as each article of clothing was taken off, Artola searched it for contraband.  Although Artola found a tissue in Wheeler's underwear, which is typically used to conceal narcotics, Artola did not find any narcotics inside the tissue.  After Wheeler had taken off all of his clothing, Artola told Wheeler to squat and spread his butt cheeks and cough, while Artola and McHugh, who were right behind Wheeler, made a visual observation to see if any narcotics could be seen in Wheeler's rectal area.  They did not see anything.

In this case, Artola conducted the strip search incident to Wheeler's arrest on the charge of criminal possession of a controlled substance in the third degree, which is a class B felony, as a result of the seizure of apparent contraband from Wheeler's car.  <u>See</u> Pl.'s Ex. 16 (Case Report cites NY Penal Law § 220.16(1)).  "At least with respect to misdemeanor offenses, the lawfulness of strip searches depends on:  the reasonable suspicion that a misdemeanor arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics

28

of the arrestee, and/or the circumstances of the arrest." <u>Blue v. City of New York</u>, 14-CV-7836

(VSB), 2018 WL 1136613, at *15 (S.D.N.Y. Mar. 1, 2018) (internal quotation marks, ellipsis,

and citations omitted).  "Whether a particular strip search is constitutional turns on an objective

assessment of the facts and circumstances confronting the searching officer at the time, and not

on the officer's actual state of mind at the time of the search." <u>Id.</u> (internal quotation marks and

citation omitted).  "[A]lthough the Supreme Court has found constitutional blanket policies

mandating strip searches of detainees who enter the general population of a jail, <u>see</u> <u>Florence v.</u>

<u>Bd. of Chosen Freeholders</u>, 566 U.S. 318, 339 (2012), suspicionless visual body cavity searches

at a police station are still subject to the <u>Hartline [v. Gallo</u>, 546 F.3d 95 (2d Cir. 2008)] standard

requiring individualized reasonable suspicion." <u>Id.</u> (internal quotation marks and citations

omitted).  Furthermore, "[a]lthough <u>Hartline</u> concerned misdemeanor offenses, other courts in

this Circuit have applied the reasonable suspicion standard to arrests for drug-related felonies."

<u>Id.</u> (citing cases).  "This individualized 'reasonable suspicion' is the same level of suspicion first

defined in <u>Terry v. Ohio</u>, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968):  the suspicion

need not rise to the level of probable cause, but it must be more substantial than an inarticulate

hunch." <u>Fate v. Charles</u>, 24 F. Supp. 3d 337, 346 (S.D.N.Y. June 5, 2014) (internal quotation

marks, alterations, and citations omitted).  "The officer must be able to justify the particular

intrusion he [or she] makes—in other words, the fact that he [or she] chooses to conduct a strip

or visual/manual body cavity search—based on specific and articulable facts which, taken

together with rational inferences from those facts, reasonably warrant that intrusion." <u>Id.</u>

(internal quotation marks and citations omitted).  Moreover, "officers are not permitted to search

arrestees in any manner they please.  All searches must be reasonable in scope and manner of

execution." Id. at 345 (internal quotation marks and citation omitted). "[T]he scope of a search bears directly on its reasonableness." Id. at 350 (citations omitted); see also Tyus v. Newton, No. 3:13-cv-01486 (SRU), 2016 WL 6090719, at *16 (D. Conn. Oct. 18, 2016) ("The Fourth Amendment requires that strip searches of inmates be reasonable. See Bell v. Wolfish, 441 U.S. 520, 559 (1979). In determining whether a particular strip search is reasonable, a court 'must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.' Id. at 559.").

Middletown Police Department policy states that a "supervisor's approval must be obtained prior to conducting a strip search," and that "[o]nly those prisoners intended to be placed in the lock up AND suspected of hiding drugs or weapons on their person will be strip-searched." Pl.'s Ex. 13 at 3. The Court finds that Artola acted in compliance with this policy insofar as the Court credits Artola's testimony that he received permission from Thoelen to conduct the strip search. Tr. 194; see also Tr. 413 (Ewanciw testified that to his knowledge, the strip search was authorized by a supervising officer). However, the Court need not determine whether Artola's request to conduct the strip search was supported by reasonable suspicion,[27] since the Court concludes that Artola, and by extension, Thoelen, are entitled to qualified immunity because the right to be free from suspicionless strip searches upon arrest for a drug-related felony was not clearly established at the time of the incident in question.

As the Second Circuit has noted,

---

[27]Artola testified that his reasons for wanting to conduct the strip search were Wheeler's possession of crack cocaine in his vehicle (a crime for which he was charged); Wheeler's delay in stopping his vehicle after Artola initiated a traffic stop; and Wheeler "being a known drug dealer," including Artola's previous observations of Wheeler selling cocaine. Tr. 193.

The doctrine of qualified immunity protects government officials from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed.2d 396 (1982). The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was "clearly established"; and (3) even if the right was "clearly established," whether it was "objectively reasonable" for the officer to believe the conduct at issue was lawful. Taravella v. Town of Wolcott, 599 F.3d 129, 133-34 (2d Cir. 2010).

Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013).

In Gonzalez, the Second Circuit explained that there are different types of bodily searches:

(1) a "strip search" occurs when a suspect is required to remove his [or her] clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out.

Id. at 158 (citing People v. Hall, 10 N.Y. 3d 303, 306-07 (2008)). The Circuit Court added, "The law governing these types of searches is far from settled; the rules alter with circumstances, and the circumstances are myriad. The key precedents turn kaleidoscopically on whether the arrest is for a felony or a misdemeanor, and whether the suspect is placed in the general prison population, among other considerations." Id. After discussing the various precedents, and whether the right at issue was "clearly established, meaning that the contours of the right are sufficiently clear that a reasonable officer would understand that what he [or she] is doing violates that right," id. at 160 (internal quotation marks, brackets, and citation omitted), the Second Circuit concluded that "a reasonable officer . . . would not have understood that conducting an otherwise suspicionless visual body cavity search of a person arrested for a felony

31

drug offense was unlawful," and that the defendants in Gonzalez were therefore entitled to

qualified immunity. Id. at 162. Here, Artola conducted a visual body cavity search of Wheeler,

who had been arrested for a felony drug offense, and although the court in Blue stated that "other

courts in this Circuit have applied the reasonable suspicion standard to arrests for drug-related

felonies," 2018 WL 1136613, at *15 , the Second Circuit itself has not, nor has the Court been

able to find any Supreme Court precedent that has. Blue did not involve an arrest on a drug-

related felony charge, and thus, the court there noted,

> [A]lthough the Second Circuit held in 2013 that the law was not clearly
> established with respect to felony drug crimes, see Gonzalez, 728 F.3d at
> 161, the Second Circuit has never held, or even suggested, that searches
> incident to lawful felony arrests for non-drug related charges are
> presumptively lawful or otherwise would not be subject to the reasonable
> suspicion standard. Rather, the relevant precedents suggest the opposite
> conclusion. Indeed, even in Gonzalez, the Second Circuit repeatedly
> emphasized that **the heightened concerns that may or may not warrant
> strip searches appear when individuals are arrested for felony drug
> crimes, as these circumstances more easily give rise to a presumption
> that an individual possesses drugs or contraband**.

Id. (emphasis added).

Accordingly, the Court concludes that Artola, McHugh, and Thoelen are entitled to

qualified immunity from liability on Wheeler's claim for an unlawful strip search.[28]

---

[28]As the Court finds that McHugh did not participate in conducting the strip search itself, to the
extent that Wheeler would seek to hold McHugh liable based on a claim of failure to intervene,
the Court finds that McHugh is entitled to qualified immunity as well.

**VII.** **Damages**

Because the Court does not find Defendants liable on any of Wheeler's claims, it does not reach the issue of damages.

## CONCLUSION

For the foregoing reasons, the Court finds that Wheeler **has failed to prove, by a preponderance of the evidence**, (1) that Defendants Artola and McHugh are liable on Wheeler's claims under 42 U.S.C. § 1983 for (a) an unlawful traffic stop, (b) a false arrest, and (c) an unlawful search of Wheeler's vehicle; (2) that Defendant Artola is liable on Wheeler's claim under 42 U.S.C. § 1983 for the use of excessive force based on (a) punching Wheeler's face, both before Wheeler was removed from his vehicle and after he was placed in handcuffs, and (b) slamming Wheeler's head into a wall during the strip search; and (3) that Defendant McHugh is liable on Wheeler's claim under 42 U.S.C. § 1983  for failure to intervene to prevent the excessive use of force during the strip search.  The Court finds that Defendants Artola, McHugh, and Thoelen are entitled to qualified immunity on Wheeler's claim under 42 U.S.C. § 1983 for an unlawful strip search.  Wheeler withdrew all of his claims against Defendant Weymer. Accordingly, the Clerk of the Court is directed to terminate Defendant Weymer from the action. The Clerk of the Court is also directed to terminate the motions at Docket ## 256, 257, 260, and 265.

Judgment shall be entered in favor of Defendants Artola, McHugh, and Thoelen.

This constitutes the Decision and Order of the Court.

Dated: September 23 2019
White Plains, New York

SO ORDERED,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

A copy of this Decision and Order has been mailed to the following:

Damon Wheeler # 78063-054
M.D.C. Brooklyn
P.O. Box 329002
Brooklyn, NY 11232